**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. GLR-13-077** |
| **TIMOTHY PRYOR** | : | |
| | : | |

**...oOo...**

**GOVERNMENT'S RESPONSE TO DEFENDANT'S PRETRIAL
MOTION TO SUPPRESS EVIDENCE**

Now comes the United States of America by its counsel, Rod J. Rosenstein, United States

Attorney for the District of Maryland, and Scott A. Lemmon, Assistant United States Attorney

for said District, and in response to the pretrial motion to suppress evidence filed by the

defendant says:

## I.     PROCEDURAL BACKGROUND

The defendant, Timothy Pryor ("Pryor") is charged in a one-count indictment alleging

that on or about October 2, 2012, he possessed a firearm after previously having been convicted

of a felony in violation of 18 U.S.C. § 922(g)(1).  The indictment was returned by a federal

grand jury on February 21, 2013.  ECF 1.   The present motion to suppress was filed on April 10,

2013.  ECF 13.

A hearing on Pryor's motion to suppress is scheduled to occur June 13, 2013 at 11:00

a.m.  Trial dates have not yet been scheduled.

## II.     FACTUAL  BACKGROUND

Around 8:25 p.m. on the evening of October 2, 2012, four officers—Detective McShane,

Detective Fisher, Detective Gorman, and Sergeant Martini—were patrolling the 600 block of

Cokesbury Avenue in Baltimore.  The detectives were aware that in that block, there had

recently been a large amount of narcotics activity, gang activity, and violence, including a recent

homicide.  Detectives McShane and Fisher were in one unmarked vehicle, and Detective

Gorman and Sergeant Martini were in a second unmarked vehicle.

Detective McShane saw a white Chrysler parked on the northbound side of the street with

its headlights on.  As the detectives drove toward the Chrysler, Detective McShane saw the

headlights of the vehicle turn off.  Detective McShane then saw that the person in the driver's

seat, later identified as Timothy Pryor, was sliding down in his seat.  In fact, Pryor was sliding

down so low that Detective McShane could see only Pryor's eyes and head at the top of the

driver's window sill.

The officers stopped their vehicles several feet away from Pryor's vehicle without

turning on their emergency lights.  There was no car in front of Pryor's vehicle, and so he was

not blocked in or prevented from driving away.

The officers then got out of their cars and, without drawing their weapons or ordering the

car's occupants to take any action, approached the vehicle.  The officers saw that there was a

person in the passenger seat, and he was later identified as Kenneth Faison.  As Detective

McShane approached Pryor, he saw that Pryor was reaching down under the driver's seat with

one hand.   Detective McShane shined a flashlight at Pryor, who sat up.  Almost immediately,

Detective McShane observed a black handgun on the floorboard next to Pryor's feet.  Detective

McShane shouted, "Gun!"  Detective Gorman opened the door and pulled Pryor out of the car,

and Pryor stated, "That's my gun."  Detective Fisher and Sergeant Martini then pulled the

passenger, Faison, out of the car.

2

Detective Fisher advised Pryor and Faison of their *Miranda* rights, and both verbally acknowledged that they understood their rights.  Detective Fisher asked what type of gun was in the car, and Pryor stated, "Glock nine millimeter."  Detective McShane secured the handgun, which was a nine millimeter caliber Glock, Model 17 handgun loaded with 13 live cartridges, including one cartridge in the chamber of the gun.

Pryor and Faison were transported to the Eastern District police station.  Pryor was again advised of his *Miranda* rights, and he completed an Explanation and Waiver of Rights form.  *See* Exhibit A.  On the reverse side of that form, Pryor provided a written statement in which he admitted that he had possessed the gun.  *See* Exhibit B.

### III.    LEGAL ANALYSIS

Pryor's boilerplate Motion to Suppress asserts that the evidence against him should be suppressed because a "warrantless search . . . was conducted in violation of the Defendant's rights."  Motion to Suppress at 1.  The motion cites, without explanation, only two cases: *Brendlin v. California*, 551 U.S. 249 (2007) (holding that passengers have standing to move for suppression of evidence that is seized during traffic stop) and *United States v. Inman*, 352 F.2d 954 (4th Cir. 1965) (vacating conviction because district court failed to allow jury to determine whether the defendant's confession was voluntary).

Both cases are inapposite, and the Court should deny Pryor's motion.  First, the officers' approach of Pryor's already-parked car did not constitute a *Terry* stop.  The officers did not draw their weapons, activate their emergency lights, block Pryor's car, ask any questions, or issue any instructions.  Under well-settled case law, the officers' approach of Pryor's vehicle simply did not constitute a seizure for the purposes of the Fourth Amendment, and so no *Terry* analysis is

required.  When the officers approached the vehicle, they observed a firearm in plain view, and

that observation fell squarely within the plain view exception to the warrant requirement.  The

officers then removed the car's occupants and secured the firearm.  Pryor made three statements,

none of which should be suppressed:  one was volunteered spontaneously, and two were made

after Pryor knowingly, intelligently, and voluntarily waived his rights under *Miranda v. Arizona*.

> **A.    Because No Seizure Occurred, the Court Need Not Conduct Any
> *Terry* Analysis.**

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures."  U.S. Const. amend. IV.  "The first step in Fourth Amendment analysis is to

identify the search or seizure at issue."  *United States v. McCoy*, 513 F.3d 405, 411 (4th Cir.

2008) (quoting *Ferguson v. City of Charleston*, 532 U.S. 67, 92 (2001) (Scalia, J., dissenting)).

A consensual encounter between the police and an individual "will not trigger Fourth

Amendment scrutiny unless it loses its consensual nature" and renders the person seized under

the Fourth Amendment.  *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  "[A] person has been

'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances

surrounding the incident, a reasonable person would have believed that he was not free to leave."

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  "Only when the officer, by means of

physical force or show of authority, has in some way restrained the liberty of a citizen may we

conclude that a 'seizure' has occurred."  *United States v. Jones*, 678 F.3d 293, 299 (4th Cir.

2012) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)); *see also California v. Hodari D.*, 499

U.S. 621, 625 (1991).  "It is axiomatic that police may approach an individual on a public street

and ask questions without implicating the Fourth Amendment's protections."  *United States v.*

*Weaver*, 282 F.3d 302, 309 (4th Cir. 2002).

In this case, the officers approached Pryor—who was sitting in a car that was parked in a public place—without seizing him.  No seizure occurs where officers "merely 'come upon an already parked car.' "  *Jones*, 678 F.3d at 302 (quoting *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994)).[1]

An approach of a parked car constitutes a seizure only when officers engage in some *additional* "show of authority."  *Hodari D.*, 499 U.S. at 628–29.  In *Jones*, for example, the Fourth Circuit concluded that police seized the defendant because "the officers blocked in [the defendant's] car to effectuate the encounter."  *Jones*, 678 F.3d at 301.  Other potential "shows of authority" include "activat[ing] the emergency lights on top of [the police] car," *United States v. Duty*, 204 Fed. Appx. 236, 239 (4th Cir. 2006), or "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled," *U.S. v. Williams*, 215 F.3d 1323, *3 (4th Cir. 2000) (unpublished) (quoting *Mendenhall*, 446 U.S. at 554).

Two Fourth Circuit cases are instructive: *United States v. Lewis*, 606 F.3d 193 (4th Cir.

---

[1] Several Circuit Courts have also concluded that "an officer's approach of a car parked in a public place does not constitute an investigatory stop [*i.e.*, a *Terry* stop] or higher echelon Fourth Amendment seizure." *Kim*, 25 F.3d at 1430 n.1 (9th Cir. 1994) (gathering cases). *See, e.g.*, *United States v. Pajari*, 715 F.2d 1378 (8th Cir. 1983) (no stop where officers merely "parked behind [the defendant's parked] car"); *United States v. Williams*, 615 F.3d 657, 664 (6th Cir. 2010) (observing that, without more, the approach of two uniformed officers in a marked police car would not suffice to make a reasonable defendant feel as though he could not leave). *See also* Lafave, 3 Search and Seizure § 9.2(h), 408-09 (2d ed. 1987) (concluding that "if an officer merely walks up to a person standing or sitting in a public place (or, indeed, who is seated in a vehicle located in a public place) and puts a question to him, this alone does not constitute a seizure") (footnotes omitted).

2010) and *United States v. General*, 237 Fed. Appx. 808 (4th Cir. 2010).  In *Lewis*, three officers observed the defendant "sitting in the driver's seat of a vehicle parked in a residential area" late at night.  606 F.3d at 195.  The officers "parked their cruiser on the opposite side of the street from [the defendant's] car."  *Id.*  Additional officers then arrived on the scene, and "several officers approached [the defendant's] vehicle."  *Id.*  One of the officers saw an open beer bottle in plain view inside the car, leading to the arrest of the defendant and the discovery of a nine-millimeter handgun.  *Id.*  The district court "concluded that the officers did not need any form of suspicion in order to approach [the defendant's] parked vehicle and ask questions."  *Id.* at 196.  The Fourth Circuit agreed, concluding that the defendant "was not 'seized' . . . when the officers approached his vehicle."  *Id.* at 197–198.

In *United States v. General*, two officers were investigating complaints of narcotics activity in the area when they approached what appeared to be two unconscious black males in a parked car.  237 Fed. Appx. at 810.  One officer stood at the passenger door, and the second officer knocked on the driver's-side window.  *Id.*  The Fourth Circuit concluded that the approach was a "consensual encounter" that "require[d] no reasonable articulable suspicion that a crime [was] occurring."  *Id.*  The court noted that the officers did not draw their weapons, touch the defendant, activate their emergency lights, or "park[] their cars so as to prevent [the defendant] from driving off."  *Id.*  The court also noted that "the mere fact that more than one officer was present does not eliminate the consensual nature of an encounter."  *Id.* (citing *Bostick*, 501 U.S. at 437–38).

In the present case, the detectives were in unmarked vehicles.  They did not box in Pryor's car, and Pryor had room to drive away.  They did not activate their emergency lights,

6

draw their weapons, or speak in a threatening tone of voice.  In sum, there was no "show of authority" that would have caused a reasonable person in Pryor's position to believe he had been seized.  The only *possible* "show of authority" here was the approach of Pryor's vehicle by officers on each side of the vehicle.  In light of the totality of the circumstances, however, that is insufficient to constitute a "seizure," and so the Court need not conduct any *Terry* analysis.  *See General*, 237 Fed. Appx. at 810 ("the mere fact that more than one officer was present does not eliminate the consensual nature of the encounter"); *Lewis*, 606 F.3d at 196–198 (holding that no investigatory stop occurred where "several" officers approached parked car).

Because no seizure occurs where officers "merely 'come upon an already parked car,' " *Jones*, 678 F.3d at 302, Pryor was seized only when the detectives removed him from the vehicle, which occurred *after* they had seen the firearm in plain view (as described *infra*, Part I.C.) and had probable cause to believe that Pryor had violated one or more Maryland handgun statutes.

> **B.     Even if a Seizure Did Occur, the Seizure was Lawful Because the Officers had a Reasonable Suspicion That Criminal Activity was Afoot.**

Even assuming *arguendo* that the officers' approach of Pryor did constitute a seizure, they had sufficient reasonable suspicion to conduct an investigatory *Terry* stop.  For officers to properly stop the occupants of an automobile, they need only have a "reasonable suspicion that [the vehicle's] occupants are engaged in criminal activity."  *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988).  Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Under the reasonable suspicion standard, a "minimal level

of objective justification" is required.  *Id.*  Reasonable suspicion is supported by "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity."  *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (internal quotation marks and citations omitted). "Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement."  *Id.* at 337.

Here, the detectives were patrolling the 600 block of Cokesbury Avenue at night because there had recently been a significant amount of violence, gang activity, and narcotics activity in the area.  As the detectives patrolled, they saw a vehicle's headlights turn off.  Detective McShane believed that the driver had recognized the unmarked police vehicles and was attempting to avoid detection.  When the detectives got closer, they saw the driver of the vehicle sliding down in his seat.  In fact, he was so low in his seat that Detective McShane could see only his eyes and the top of his head at the window sill of the driver's-side window, again causing Detective McShane to believe that the driver was attempting to avoid being noticed by the detectives.  As Detective McShane stopped his car and approached Pryor's vehicle, he saw that Pryor was still slumped down in his seat and was reaching towards the floorboard of the car. The Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *Wardlow*, 528 U.S. at 124; *see also Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (concluding that defendant aroused suspicion in part due to his "strange movements in his attempt to evade the officers").  Additionally, the Fourth Circuit "ha[s] repeatedly recognized that evasive reactions to the presence of police may be considered in

determining whether reasonable suspicion exists for an investigatory stop." *United States v*

*Smith*, 396 F.3d 579, 584 (4th Cir. 2005) (citing *United States v. Sims*, 296 F.3d 284, 287 (4th

Cir. 2002)).  *Sims* is particularly apposite here:  in that case, the defendant was "crouching" and

"peeking around the corner."  296 F.3d at 287.  The Fourth Circuit concluded that those actions

properly caused the officer to believe that the defendant was not "merely 'go[ing] about his

business,' " and the "officer could quite reasonably conclude that he was hiding," *id.* (citing

*Wardlow*, 528 U.S. at 125), and so the investigatory stop was proper.

Detective McShane then saw the handgun in plain view on the floorboard of the car.

Assuming *arguendo* that the detectives' approach of the vehicle did constitute a *Terry* stop, then

it was proper because the facts of this case, viewed in their totality, provided the detectives with

sufficient reasonable suspicion to believe that criminal activity was afoot.

### C.     Detective McShane Saw the Firearm in Plain View on the Floorboard of Pryor's Vehicle, and He Properly Seized It.

During the stop, Detective McShane looked through the vehicle's window, saw a black,

semi-automatic handgun on the driver's-side floorboard next to Pryor's feet, and properly seized

the handgun.[2]  *See United States v. Simmons*, 354 Fed. Appx. 789, 791 (4th Cir. 2009)

(concluding that firearm "was found in plain view on the driver's lap, and therefore was properly

seized by the law enforcement officers"); *United States v. Davis*, No. 10–5001, 2011 WL

1691832, at *1 (4th Cir. May 5, 2011) (same).

-----

[2]  The detectives also properly removed the vehicle's occupants.  The Supreme court has
described the "especially hazardous" risks involved in approaching suspects in vehicles.
*Michigan v. Long*, 463 U.S. 1032, 1049 (1983).  Here, both Pryor and Faison were capable of
reaching the firearm, and so the officers had a right to remove them to protect their own safety
under *Terry*.

Although warrantless searches are generally *per se* unreasonable, there are "a few specifically established and well-delineated exceptions." *United States v. Williams*, 592 F.3d 511, 521 (4th Cir. 2010) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)).  One exception is the plain view doctrine, which "is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983) (emphasis added).  Officers "may seize evidence in plain view during a lawful search if (1) the seizing officer is 'lawfully present at the place from which the evidence can be plainly viewed'; (2) the seizing officer has 'a lawful right of access to the object itself'; and (3) 'the object's incriminating character [is] . . . immediately apparent.' " *Williams*, 592 F.3d at 521 (quoting *United States v. Legg*, 18 F.3d 240, 242 (4th Cir. 1994)) (internal quotations omitted).

Here, each prong of that test has been satisfied.  First, the detectives were standing on a public street, and so they were "lawfully present at the place from which the evidence [could] be plainly viewed." *Williams*, 592 F.3d at 521.  Notably, the plain view exception applies even where officers use flashlights. *See United States v. Smith*, 456 Fed. Appx. 200, 208 (4th Cir. 2011) (citing *United States v. Dunn*, 480 U.S. 294, 305 (1987)) ("Police officers do not conduct a search under the Fourth Amendment when, stationed in a place where they have a right to be, they observe objects in plain view, or use a flashlight to illuminate the area where the object is located."). *See also Texas v. Brown*, 460 U.S. 730, 739–40 (1983) ("It is likewise beyond dispute that [the officer's] action in shining his flashlight to illuminate the interior of [the defendant's] car trenched upon no right secured to the latter by the Fourth Amendment.").

10

Second, the detectives had "a lawful right of access to the object itself." *Williams*, 592

F.3d at 521.  An officer who sees an incriminating object in plain view inside a vehicle may

seize that object.  *See Texas v. Brown*, 460 U.S. 730, 741 n. 6 (1983) (citing *United States v.*

*Ross*, 456 U.S. 798 (1982)).

Finally, "the object's incriminating character [was] . . . immediately apparent." *Williams*,

592 F.3d at 521.  Under Maryland law, it is illegal to transport firearms in vehicles except in

narrow circumstances that were not present here.  *See* MD Code Ann., Criminal § 4-203(a).[3]

Even if the detectives did not have reason to believe that a handgun statute had been violated,

they were permitted to seize the weapon "for their own self-protection within the *Terry*

rationale" or because they "were acting in a community caretaker function when the gun was

discovered."    *See United States v. Bishop*, 338 F.3d 623, 627 (6th Cir. 2003) (upholding seizure

of firearm from parked car).  Finally, after the gun had been seized, it "became contraband and

subject to seizure when the officers learned of the defendant's prior felony conviction." *Id.* at

628.

---

[3] (a)(1) Except as provided in subsection (b) of this section, a person may not:
. . .
(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State[.]

MD Code Ann., Criminal § 4-203(a).  In order to legally transport a handgun in a vehicle in Maryland, the person must be transporting "an unloaded gun between the person's 'bona fide residences, or to and from a target shoot or a hunt." *McDaniel v. Arnold*, --- F.Supp.2d ----, 2012 WL 4903041 (D. Md. 2012) (citing MD Code Ann., Criminal § 4–203(b)(4)–(6)).

> **D.  Pryor Spontaneously Volunteered His First Statement, and He Voluntarily Waived His *Miranda* Rights Before He Made Subsequent Verbal and Written Statements.**

Pryor's motion to suppress cites only one case addressing confessions by defendants.  *See* Motion at 2 (citing *Inman*, 352 F.2d 954).  That case, however, does not discuss confessions in the context of a motion to suppress evidence; rather, it addresses only whether judges or juries should determine the voluntariness of confessions, *id.* at 955–56, which is not at issue during the suppression stage.

Even assuming that Pryor intended to argue that his three statements should be suppressed, the Court should deny that request.  As explained above, there was no improper search or seizure here, and so Pryor's statements need not be suppressed as "fruit of the poisonous tree."  *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Additionally, the statements should not be suppressed under *Miranda v. Arizona*,  384 U.S. 436 (1966) and its progeny; Pryor spontaneously volunteered one statement, and he made the remaining two statements after knowingly, intelligently, and voluntarily waiving his *Miranda* rights.  Each of his statements are considered in turn.

> **1.  "That's my gun."**

As the officers were removing Pryor from the vehicle, he blurted—without having been asked any questions—"That's my gun."  It is well-settled that statements spontaneously *volunteered* by a defendant in custody need not be suppressed.  *See Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today"); *see also Rhode Island v. Innis*, 446 U.S. 291, 299–301 (1980) (same).

At the time Pryor stated "That's my gun," he was being removed from the vehicle and therefore was in custody.  The detectives, however, had not asked him any questions or otherwise prompted him to speak, and so the statement was spontaneously volunteered.  There is no evidence "showing a 'measure of compulsion above and beyond that inherent in custody itself.' "  *Innis*, 446 U.S. at 300.  For that reason, the statement "That's my gun" should not be suppressed.

### 2.    "Glock nine millimeter."

After Pryor was removed from the vehicle, Detective Fisher informed Pryor of his rights under *Miranda v. Arizona*, and Pryor acknowledged that he understood those rights.  Detective Fisher then asked Pryor what type of gun was in the car, and Pryor stated, "Glock nine millimeter."[4]

"A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda v. Arizona*, and the defendant knowingly, intelligently, and voluntarily waives those rights."  *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012) (citing *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997) (internal citation omitted)).  The Court must determine "whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."  *Id.* (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)).  "The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired."  *Id.* (quoting *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997)).

---

[4] The gun was, in fact, a nine millimeter caliber Glock handgun.

Here, Detective Fisher properly advised Pryor of his *Miranda* rights without making threats, using violence, offering direct or implied promises, or otherwise exerting any improper influence.  Pryor was not intoxicated or otherwise mentally impaired at the time.  Pryor verbally acknowledged that he understood his rights and agreed to waive them.  Because Pryor's waiver was knowing, intelligent, and voluntary, his subsequent statement ("Glock nine millimeter") should not be suppressed.

### 3.      The written statement.

Pryor was then taken to the police station where Detective Fisher again explained to Pryor his rights under *Miranda v. Arizona*.  Pryor acknowledged in writing that he understood those rights and agreed to waive them.  *See* Exhibit A.  No one made any threats or otherwise attempted to improperly influence Pryor, and he was not intoxicated or otherwise mentally impaired.  His written statement shows that he knowingly, intelligently, and voluntarily waived his *Miranda* rights, *see Holmes*, 670 F.3d at 591, and for that reason, the Court should not suppress his subsequent written statement in which he admitted that he possessed the firearm.

### Conclusion

Pryor was not seized when the officers initially approached his parked car, and so the Court need not conduct a *Terry* or probable cause analysis to determine whether that approach was proper.  Even assuming *arguendo* that he was seized, the officers had reasonable suspicion to believe that criminal activity was afoot, and so an investigatory stop of Pryor would have been proper.  The detectives then saw a firearm in plain view, properly removed the occupants from the vehicle, and seized the firearm.  Finally, Pryor's statements should not be suppressed; he volunteered one statement and knowingly and voluntarily waived his *Miranda* rights for two

14

other statements.  The government respectfully submits that, for these reasons, the defendant's motion to suppress evidence should be denied.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____*/s/ Scott A. Lemmon*_____
Scott A. Lemmon
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4831

**Certificate of Service**

I hereby certify that on this 31st day of May, 2013, a copy of the foregoing

Government's Response to Defendant's Motion To Suppress Evidence was electronically filed

with the Clerk of the District Court and by that means served upon counsel for the defendant.


      */s/ Scott A. Lemmon*
Scott A. Lemmon
Assistant United States Attorney